UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA,                    :

                Plaintiff,                    :

                             :    **(S1) 12-CR-00884 (DLC)**

    -against-                    :

RUVEN KATZ,                    :

              Defendant.                    :
-------------------------------------------------------X


# SENTENCING MEMORANDUM


Kenneth J. Kaplan
KAPLAN & KATZBERG
767 Third Avenue, 26th Fl.
New York, New York 10017

Counsel for Ruven Katz


Mayo Schreiber, Jr.
On the Brief

# TABLE OF CONTENTS

Page No.

I. INTRODUCTION...................................................................1

    Superseding Indictment............................................ 2

    The Plea Agreement...............................................3

    Procedural History.................................................4

II. GENERAL SENTENCING GUIDELINES...........................5

III. PERSONAL HISTORY...........................................................7

    Family Life, Immigration and Work History.....................7

    Financial History.....................................9

    Divorce and Reconciliation with Tanya and Relationship
    With Daughters.........................................................9

    Devotion to Elderly Mother and Care of Others.................11

    Generosity and Helpfulness with Friends and Others
    In the Community......................................................13

    Work History..........................................................15

    Acceptance of Responsibility and Collateral Consequences
    of this Case............................................................16

IV.    SENTENCING CONSIDERATIONS..............................18

i

The Factors Enumerated in §3553(a) Indicate that a Non-Custodial Sentence for Ruven Katz is Appropriate.............18

1. Nature and Circumstances of the Offense and History and Characteristics of the Defendant Under 18 U.S.C. §3553(a)(1)...................................................................18

2. Factors Under 18 U.S.C. §3553(a)(2)..........................20

V. CONCLUSION..................................................................22

# TABLE OF AUTHORITIES

**Cases**                                                                **Pages(s)**

Gall v. United States, 552 U.S. 38 (2007)...........................5

Kimbrough v. United States, 552 U.S. 85 (2007)....................5

Nelson v. United States, 555 U.S. 350 (2009).......................5

Simon v. United States, 361 F.Supp.2d 35, 48  (E.D.N.Y. 2005).......................................................................21

United States v. Barbera, 2005 WL 2709112 (S.D.N.Y.)..........21

United States v. Booker, 543 U.S. 220 (2005).......................5

United States v. Carmona-Rodriguez, 2005 WL 840464 (S.D.N.Y.)......................................................................21

United States v. Hernandez, 2005 WL 1232344 (S.D.N.Y.).......21

United States v. Hodges, 2009 WL 366231 (E.D.N.Y.)...........21

United States v. Jones, 531 F.3d 163 (2d Cir. 2008)...............5

United States v. Nellum, 2005 WL 300073 (N.D. Ind.)...........21

United States v. Sanchez, 2007 WL 60517 (S.D.N.Y.).............21

**Statutes**

18 U.S.C. §1341.............................................................2

18 U.S.C. §1347.............................................................2

18 U.S.C. §1349……………………………………………..3

18 U.S.C. §3553(a)……………………………………….5, 6, 18

18 U.S.C. §3553(a)(1)…………………………………….. 6, 18

18 U.S.C. §3553(a)(2)……………………………………5-6, 20

18 U.S.C. §3553(a)(2)(C)………………………………….20

18 U.S.C. §3553(a)(3)……………………………………..6

18 U.S.C. §3553(a)(5)(A)…………………………………6

18 U.S.C. §3553(a)(6)…………………………………….6

18 U.S.C. §3553(a)(7)…………………………………6, 20

18 U.S.C. §3661…………………………………………..6

**United States Sentencing Guidelines**

U.S.S.G. §2B1.1(b)(1)(F)……………………………….3

U.S.S.G. §3B1.1(b)……………………………………..3

U.S.S.G. §3E1.1………………………………………..4

**Unites States Sentencing Commission**

*Measuring Recidivism: The Criminal History Computation*
*of the Federal Sentencing Guideline (May 2004)*………………20-22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
UNITED STATES OF AMERICA,          :

               Plaintiff,          :

                       :          **(S1) 12-CR-00884 (DLC)**

      -against-          :

RUVEN KATZ,          :

              Defendant.          :
-----------------------------------------------------X

## I. <u>INTRODUCTION</u>

This memorandum is respectfully submitted in connection with Ruven Katz's sentencing in the above-captioned matter. The facts presented and arguments made herein are not intended to condone the conduct which brings Mr. Katz before the Court. Rather, we provide this information in the belief that a full explication of the circumstances of this offense in the context of his life will demonstrate that Mr. Katz merits the Court's compassion and consideration. As the Court will understand from the letters written on his behalf, Mr. Katz is an extremely compassionate person, loving and devoted father, supportive son, and has and will suffer greatly for his actions in this matter. This is his first, and undoubtedly only, offense.

This memorandum sets forth the details of the offense, his plea agreement, reviews Mr. Katz's personal history, the criminal conduct, the collateral

consequences his conviction is causing him and his family, and other relevant factors the Court might consider in imposing a sentence.

## **The Superseding Indictment**

On November 27, 2012, a superseding indictment was filed against Ruven Katz charging him with conspiracy to commit health care and mail fraud. In this one-count indictment, it is alleged that the defendants, including personnel of the health care clinics, an attorney, hospital employees, a neurosurgeon, and patients, conspired to commit mail fraud, defraud a health care program, and obtain, by means of false and fraudulent pretenses, representations, and promises, money owned by and under the custody and control of a health care program, in violation of 18 U.S.C. §§1341 and 1347. Specifically, it is alleged that defendants Ruven Katz, Ben-Zion Kliot and Zahi Kliot were responsible for the "oversight" of the Gotham Medical Clinic. Their alleged duties included paying "[r]unners and patients," supervising the submission of fraudulent billing to insurance companies, and coaching and managing patients. Defendant neurological surgeon Alexandre Scheer is alleged to own Gotham Medical and have performed unnecessary examinations and treatments on patients there to increase fraudulent billings. He also allegedly processed and submitted fraudulent billings to insurance companies.

Defendant Rafael Djafarov allegedly "managed" two separate no-fault clinics, Jamaica Medical and Remsen Medical (hereinafter "Djafarov Clinics").

2

Defendant attorney Sol Naimark, the sole defendant attorney, is alleged to have seen new patients in his office who had been recruited by runners, and referred them to either Gotham Medical or the Djafarov Clinics. It is alleged that Naimark would pay a runner for each new patient, and continue to pay the runner based on the patient's insurance coverage and how many times the runner visited one of the clinics.

Defendants Karlene Tullonge, Rene Wynne, and Michael Spruill allegedly provided runners with names of patients to recruit to the clinics, or acted as a liaison with a hospital employee. Finally, defendants Jerry Baptiste, Bertram Baptiste, Stephanie Fogle and Arthur Davis were patients brought by the runners to Gotham Medical and the Djafarov Clinics, who allegedly received unnecessary medical treatment and facilitated fraudulent billings to insurance companies.

## The Plea Agreement

On May 30, 2013, Mr. Katz, accepting responsibility for his actions, entered into a plea agreement with the government. Pursuant to the plea agreement, Ruven pled guilty to Count One of the Indictment, conspiracy to commit health care fraud, in violation of Title 18, United States Code §1349.   The parties stipulated that the sentencing guideline offense level is 16, based on the combination of the following Sentencing Guidelines: (a) six levels for loss of more than $120,000 but less than $200,00 under §2B1.1(b)(1)(F); (b) three levels under §3B1.1(b) because

3

the defendant was a supervisor in the conspiracy and the conspiracy involved five or more participants or was otherwise extensive;[1] (c) and a reduction of three levels for acceptance of responsibility under §3E1.1.   Under a level 16, there is a guideline range of 21 to 27 months' imprisonment.   Additionally, Mr. Katz has agreed to restitution in the amount of $190,400.

## **Procedural History**

The government's understanding of the case has changed significantly with further investigation and discussions with the defendants.  Significantly, deferral of prosecution agreements have been entered against the owner of Gotham Medical, Alexandre Scheer, M.D.; Jerry Baptiste; Betram Baptiste; and Stephanie Fogle. Karlene Tullonge and Karen Blair have entered guilty pleas to a misdemeanor count of a superseding information.   Attorney Sol Naimark pled guilty to a different indictment in the Southern District of New York and a *Nolle Prosequi* was entered against him in this case.

In addition to Mr. Katz, six other defendants, Rafael Djafarov, Ben-Zion Kliot, Zahi Kliot, Arthur Davis, Renee Wynne and Michael Spruill, have entered pleas of guilty to Count One of the superseding indictment.  Regarding Mr. Katz (as discussed more fully below at pp. 18-19), there is no longer a suggestion that he

---

[1] The government and defense counsel agree that this enhancement is appropriate only because Mr. Katz supervised one co-defendant, Zahi Kliot, and that there were five or more participants in the conspiracy, rather than application of the enhancement for Katz being the supervisor of five or more participants in the conspiracy.

was involved in improper billing, but rather his activity was confined to paying "runners" to create a patient pool for Dr. Scheer.

## II. GENERAL SENTENCING STANDARDS

As the Court is aware, the Federal Sentencing Guidelines are no longer mandatory but one of several factors which the Court must consider in imposing sentence. See United States v. Booker, 543 U.S. 220 (2005); Gall v. United States, 552 U.S. 38 (2007); and Kimbrough v. United States, 552 U.S. 85 (2007). In Gall the Court explained that while the Guidelines should be "the starting point and the initial benchmark" of a reasonable sentence, the sentencing judge "may not presume that the Guideline range is reasonable" and instead "must make an individualized assessment based on the facts presented." Id., 552 U.S. at 49-50. See also United States v. Jones, 531 F.3d 163, 182 (2d Cir. 2008). Indeed, the Supreme Court underscored this finding in Nelson v. United States, 550 U.S. 350, 352 (2009): "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable" (emphasis in original).

Instead, the Court must consider all the factors in the Federal Sentencing Act, 18 U.S.C. §3553(a). See Gall, 552 U.S. at 50. Section 3553(a) directs that sentencing courts "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." Section 3553(a)(2) states that such purposes are:

5

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most efficient manner.

In determining the minimally sufficient sentence, 18 U.S.C. §3553(a) further directs the sentencing courts to consider the following factors:

> the nature and circumstances of the offense and the history and characteristics of the defendant [18 U.S.C. §3553(a)(1)];
>
> the kinds of sentences available [18 U.S.C. §3553(a)(3)];
>
> any pertinent policy statement . . . issued by the Sentencing Commission . . . [18 U.S.C. §3553(a)(5)(A)];
>
> the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct [18 U.S.C. §3553(a)(6)]; and
>
> the need to provide restitution to any victims of the offense [18 U.S.C. §3553(a)(7)].

Furthermore, 18 U.S.C. §3661, provides that "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Toward these ends, the following

6

information regarding Ruven's personal background, his criminal conduct, and family and friends is presented for the Court's review.

### III. PERSONAL HISTORY

### Family Life, Immigration and Work History

Ruven Katz was born in 1956 in Riga, Latvia (which at the time was part of the U.S.S.R.) to Leiba Katz and Gita Rotbart Katz. He has no siblings. His father worked as a butcher and his mother as an accountant. His family was Jewish, although not religious. At the time there was widespread anti-Semitism in Riga. Ruven recalls being called names and being attacked by other boys as a child and adolescence, and his parents facing job discrimination due to their religious background. His parents, desiring that their son not live in anti-Semitic country, and have opportunities equal to other citizens, sought official permission to immigrate to Israel. For eight years they repeatedly petitioned the government and were finally allowed to leave Riga for Israel in 1971, when Ruven was fourteen years old.

In Israel it was difficult for his parents to find work and his family's standard of living was lower than in Latvia. For the next four years, to complete his high school education, Ruven attended a public boarding school, the Ort School in Ashdot, Israel, and learned to speak Hebrew. After graduating from high school, Ruven spent three years completing his mandatory military service in the

7

Israeli navy.   A friend, Boris Levine, who served with him in the Israel Defense Forces, notes: ". . . Ruven was a distinguished and noteworthy soldier in the Israeli naval forces."  Letter of Boris Levin, dated July 22, 2013, attached as Exhibit "A."

After immigrating to the United States (see below for a fuller discussion), Ruven met Tanya Shpak on a blind date in Far Rockaway in 1989.   They quickly developed a very strong bond and married in April 1990.   Tanya was married previously, and had a child, Olivia, who was then eight years old and lived with her.   In December 1990 Ruven and Tanya had a child together, Jacqueline.

Ruven is extremely close to both children.  Tanya notes:

> [t]wenty-four years ago, Ruven walked into my life and embraced my eight-year old daughter, Olivia and myself.  From that moment forward, Ruven played a tremendous role in Olivia's life.  Olivia was a rebellious little girl, but Ruven put all of his effort and time to overcome all the obstacles that he was facing as a new father.  It was his top priority to create a life for all of us together as a starting family. Shortly we had a child of our own, Jacqueline, and Ruven was always devoted to raise the girls equally as his own.  Because of Ruven's love, support and sacrifice Olivia turned out to be a successful, intelligent, and caring young woman.   Olivia is married and earned her degree as a Doctor of Pharmacy.
>
> As a mother, I will be forever grateful to Ruven for our two wonderful daughters.   They turned out to be close, loving, and devoted sisters not only to each other, but kind, compassionate, and respectful human beings to all people that surround them.  They take after their father.

Letter of Tanya Katz, dated August 5, 2013, attached as Exhibit "B."

8

## Financial History

Though hard work and thrift, Ruven was able to pay off the mortgage on the home they had purchased and save some of his earnings. In 2005 friends told him of investments they were making in commercial real estate in Cape Coral, Florida. Ruven joined his friends, taking out more than $730,000 in equity from his home thru a home equity line of credit (which he still owes with Tanya), and investing his and his wife's entire savings. His investments in Cape Coral real estate totaled approximately $1,400,000. As a result of the "great recession" and collapse of the housing market in 2008, Ruven lost all his investments and was sued by the banks that loaned Ruven and his friends money. Ultimately, the banks obtained a judgment against him and his partners for $3,066,305.16 in Supreme Court, Nassau County, for which he is still jointly and severally liable.

## Divorce and Reconciliation with Tanya and Relationship with Daughters

The losses connected to the Florida real estate investments caused enormous financial stress on Ruven, who started drinking heavily to cope. This in turn caused marital problems, and Tanya divorced Ruven in December 2008. Tanya states:

> [w]e were a happily married couple until Ruven made unsuccessful financial investments. As a family we were faced with a very challenging situation, and lost all of our money. These circumstances led Ruven to abuse alcohol as an escape from all the stress that we were facing as a couple. Our family started to crumble. Ruven and I were both very devastated when our marriage concluded in a divorce

9

in 2008.  The pain that we both endured was tremendous and left a scar.

Exhibit "B."

After the divorce Ruven remained very close to his daughters, visiting with them frequently.  Jacqueline writes:

> [s]ince the day I was able to understand the meaning of love and respect I knew I was spoiled with both.  Growing up my father has flipped over backwards to make sure I never felt anything less then loved and nurtured.  He made sure respect and important values were instilled in me to guarantee I grow up to be the best person I can be . . . I always worry about the person I have become and the person I am perceived as based off of him.  I look up to him more then life itself, and he is my hero as much as my role model.  I always knew if I became half as great a person as he, I would be fulfilled . . .

> Growing up I had never felt pressured by my father.  I have set standards for myself strictly based on what I have perceived from him and his ways.  The love and respect I embrace for my elders is solely developed from him, and has molded me to the person I am today.  The person I try to be, and the person I want to be are derived strictly on what I believe he would be proud of . . . The warmth in his heart, the good nature of his ways, motivate me and are what I hope I can reflect to the people in my life.

Letter of Jacqueline Katz, dated July 28, 2013, attached as Exhibit "C."  Olivia writes:

> [a]t the age of 8, I was blessed with unconditional love from my father Ruven Katz who married my mother . . . Because of him, I am now a well established independent young woman, and hold a degree in Doctor of Pharmacy.  I look up to him with the utmost love and admiration . . . He is the kind of man who put his heart and soul into raising me.  During my upbringing, I was very rebellious and always steered in the wrong direction.  I can't remember a time when he wasn't there to put me right back on track.  Because of him I am the

woman I am today, and beyond grateful to him everyday.

[a] few years back, during a painful family separation, I with open arms took my dad in to live with my husband and I. Whom I am happily married to for 4 years. Currently I am happy to see that my parents are trying to reconcile at the most difficult time of their lives. At these trying times, I watch my father value every single day with my mother.

Letter of Olivia G. Belenky, dated August 2, 2013, attached as Exhibit "D." Ruven and Tanya reconciled in 2011 and are currently living together.

## Devotion to Elderly Mother and Care of Others

In addition to being a loving and respected father, Ruven is a particularly devoted son. All his friends note how much love and concern he has for his 87 year old mother, and how he takes care of her, despite the great distance between them. Boris Levin writes:

" . . . I would like to mention his extraordinary care and relationship he maintains with his mother, his daily phone calls with his mother which go on for hours, his flights all the way to Israel every 3 months just to be with her and make her happy . . .

Aside of his regular visits to his mother, Ruven has begun visiting his mother more frequently due to her illness, rushing to the side of her bed every time she lays in bed sick, cheering her up and supporting her physically and mentally.

I know in fact that the thought of him unable to take care of his mother in the time she needs him most, causes Ruven unbearable grief and agony.

Attachment "A." Another friend echoes this assessment:

[h]e is a devoted son, he shows his big heart by taking care of his 87

11

year old mother. She lives in Israel and he is on the phone everyday with her. He has taken almost every vacation and he flies to Israel to spend time with her. While with his mother he is repairing and cleaning the apartment, spending every moment making sure everything is perfect for her.

Letter of Edward Krivosheyev, dated July 24, 2013, attached as Exhibit "E."

Not only is Ruven an extraordinary son, he also generous with his time and compassionate with the mothers of other friends. His friend Mila Mereshensky writes:

Ruven checks in with his mother daily on the phone, and makes efforts to visit her every other month. As my mother also lives in Israel, Ruven has made time during his visits to see her, ensure her comfort and has even taken her to visit the gravesite of her late husband. This gesture of kindness was carried out unbeknownst to me, a true testament to his generosity and selflessness.

Letter of Mila Mereshensky, dated July 22, 2013, attached as Exhibit "F." His daughter Jacqueline explains:

[w]hen his father had passed away several years ago it became an even bigger commitment to visit my grandmother. It is crucial to my father . . . that my grandmother never feels neglected. The values I hold for family are strictly built on the relationship and actions of my father and his care for his parents. Not only is my father a sensitive son, he is a remarkable son in law. My father treats his mother in law like his own mother. The care, sacrifices, and love he offers her would fool anyone to believe she was his own mother. The stability he provides, the small unaccountable errands, he truly goes above and beyond for her. I know my grandmother has the utmost respect for him and loves him as her own as well.

Attachment "C."

## Generosity and Helpfulness with Friends and Others in the Community

Ruven has many friends and they all are grateful for his friendship and the help he has given them over the years. Edward Krivosheyev writes:

> I have seen Ruven Katz's good nature and his desire to help everyone around him. I have had his help many times, when I was fixing my house. In one case . . . my basement flooded and I needed as much help as I could get. He was there the next day and took almost a week to finish. He helped me completely redo my foundation and always had a smile on his face.

Exhibit "E." His friend Steven Fruman describes Ruven as someone who:

> . . . inspires [him] with his generosity and willingness to help others in need . . .
>
> At the most difficult, vulnerable times of our lives, Ruven was always there for us and offered his help to overcome some of the life obstacles we were faced with. One year ago my father was battling a very aggressive type of cancer. He was facing six months of chemo and radiation therapy, a very complicated surgery a difficult recovery. This verdict left a tremendous emotional impact on my family and I. Ruven always offered his emotional and physical support and made himself available to take my father to the hospital for his treatments when I couldn't do it, for which I will always be grateful to him.
>
> Furthermore during hurricane Sandy, my wife and I were away and my three children were left at home with the grandparents who were helpless during this dangerous situation. In addition to all the dangers of the storm, my youngest daughter who was 18 months old at that time, got sick with croup and had to be admitted to the hospital. Sacrificing his own safety, Ruven came in help to my family during this difficult time.

Letter of Steven Fruman, dated July 30, 2013, attached as Exhibit "G." Another friend who has known Ruven for twenty years writes:

13

> [w]hen my husband was in the hospital for a month, Ruven was by my side. He came to the hospital almost every day. He helped me so much, I do not know how I would have managed without him. When I brought my husband he was there, talking to him and helping him recover.

Letter of Irene Szusterman, attached as Exhibit "H." Eli Gaba notes: "[a]ny charitable cause or organization that I was involved with, Ruven always participated generously. Any time I did not feel well he was always a concerned friend. He is always the first to visit a sick person and bring him some chicken soup." Letter of Eli Gaba, attached as Exhibit "I." <u>See also</u> Letter of Irene Lupolover, dated August 3, 2013, attached as Exhibit "J" (". . . when my sick elderly parents needed help, Ruven was there to help out, regardless of how it would interfere with his daily routine"); and Letter of Alex Kogan, dated August 4, 2013, attached as Exhibit "K" ("[m]any times, during the years, Ruven was helpful to me when I was in need of a friend or advisor: always listening, always being there and always generous for a good cause").

Finally, Rabbi Dan Dashevsky, Administrator of Educational and Outreach Programs at the Cong. Friends of Refugees of Eastern Europe, who knows Ruven very well, states:

> I am writing this letter in support of Ruven Katz in connection with his upcoming sentencing. I have known Ruven for quite some time and found him to be a very kind and sincere man. He volunteers in our synagogue to serve meals to the elderly people that attend our services or simply come to have something to eat on Sabbath and holidays. His compassion has no boundaries. I had personally

14

observed Ruven handing out food on Sabbath with so much care and
sympathy to the people in need.

An immigrant himself, Mr. Katz wanted very much to help new
immigrant families. He offered and assisted us in organizing out of
school and holiday programs for underprivileged youth. As result,
many children had benefited tremendously from our programs.

Letter of Rabbi Dan Dashevsky, dated July 22, 2013, attached as Exhibit "L."

## **Work History**

Ruven has always been a hard, steady worker, supporting first himself, and
then his family, through a variety of jobs. His first job was with Mul-T-Lock, Ltd.
in Israel. After working there for three years, he opened his own business, MK
Dental Supply, specializing in dental supplies. He ran this business for four years.
During this time he was single and lived with his parents.

At the end of four years he decided he needed a change. He decided to get a
fresh start on life and was hopeful that in a new environment, he might meet a
prospective partner. Having friends in the United States, he came here on a
vacation, and liking what he saw, in 1986 he decided to stay. He applied for a visa
and lived with distant relatives in Scarsdale in Westchester County.

His relatives' residence needed to be renovated, and for help with the
renovation, they provided him with food and shelter. After the renovation was
complete, he got a job as a salesman at Marcus Lupo Jewelry on 47th Street in
Manhattan where he worked for two years, from 1987 until 1988. After finding

employment he rented an apartment in Brooklyn.

In 1988 Ruven decided to start his own business, Ruveni Jewelry (which later became RK Trading), a jewelry wholesaler.   Unfortunately, as a jewelry wholesaler, he was robbed several times, and finding the business too dangerous, he stopped selling jewelry wholesale.  From 1998 thru 2009 he was employed by Hillmed Management.  Thereafter, he worked at various jobs related to the medical field until December 2012, when he was arrested and became unemployed.

### Acceptance of Responsibility and Collateral Consequences of this Case

At his plea allocution, Ruven stated

[a]lthough I was not involved in the billing for patients or any other medical decisions at the clinic, I knew that the runner would only receive payments if the patients got treatment and continued to get treatment over time, without regard to medical necessity.  I understand that what I was doing was illegal and was defrauding insurance carriers.

I am sorry and deeply ashamed for having been involved in the conduct which has brought me before the court.

PSR at ¶33.  His wife, who knows Ruven best, remarks: "Ruven and I have had many lengthy conversations and he has expressed how sorry he is for all his poor judgment and actions.  He is taking full responsibility and is remorseful for what had occurred."  Attachment "B."  See also Letter of Eli Gaba, attached as Exhibit "I"("he . . . has accepted responsibility for his actions . . . [and] is rehabilitating himself and is addressing all of his problems").

16

Not only is Ruven deeply ashamed for what he has done and brought upon himself, but his remorse is greater now that he fully understands how his actions will affect the people whom he loves and depend upon him. Due to his loss of job and the present prospect of incarceration, he will no longer be able to help support Tanya and pay for the home that they share and she is so proud of. Tanya's income is very small and insufficient to pay for household expenses.

Moreover, he is in utter despair about his 87 year old sick and infirm mother, who lives in Israel and whom he will not be able to care for in the foreseeable future. His close friend Boris notes: "I know in fact that the thought of him unable to take care of his mother in the time she needs him most, causes Ruven unbearable grief and agony." Attachment "A." Ruven is so fearful of the shock to his mother due to his actions in this case and his inability to visit her due to his upcoming incarceration, that he has been unable to tell his mother what he has done and how the consequences of his actions will affect her and the rest of his family.

Finally, Ruven's financial downfall is complete as a result of his actions in this case. As an initial matter, due to the large home equity loan he took to make his Florida real estate investments, and the collapse of real estate values in Florida during the "great recession," not only has he caused his Tanya's (and his former) home to be worth less than its purchase price, but he also faces an enormous

judgment against him by the banks that loaned him and his friends money for the real estates investments. He has a large negative net worth and his actions in this case have engendered a restitution obligation of $190,400. As the result of his felony conviction (and his age of fifty-six years) his ability to find work will be greatly hampered, exacerbating his extreme financial hardship.

## IV. SENTENCING CONSIDERATIONS

### The Factors Enumerated in §3553(a) Indicate that a Non-Custodial Sentence for Ruven Katz is Appropriate

An analysis of the §3553(a) factors offers strong support for a sentence below the guideline of range set forth in Mr. Katz's plea agreement. As the Court is aware, the sentence imposed must be "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. §3553(a).

### 1. Nature and Circumstances of the Offense and History and Characteristics of the Defendant Under 18 U.S.C. §3553(a)(1)

As noted above, the breadth and scope of the original allegations of this case have changed. Some of the key defendants, for example, Dr. Scheer, the owner of the Gotham Medical, has entered into a deferred prosecution agreement, and other defendants have pled to misdemeanor charges. The extent and magnitude of this case have changed. Originally, as detailed in the indictment, the government alleged that Mr. Katz and co-defendant Kliot were engaged as *de facto* owners of

18

the clinic and had created a scheme together with Dr. Scheer, the actual owner of the clinic to bill for unnecessary service and submit fraudulent billings. In fact, Mr. Katz's participation together with co-defendant Benny Kliot, was as an independent contractor generating patients for the clinic and in doing so, using paid "runners" to attract patients to the clinic. By virtue of this activity Mr. Katz violated the law by attracting patients to the clinic without regard to medical necessity, especially where it was in Mr. Katz's and Mr. Kliot's best interest to have patients return for enough visits to justify their compensation by Dr. Scheer. Significantly, however, Mr. Katz and Mr. Kliot had nothing to do with billing or medical decisions which were solely the provenance of Dr. Scheer. The fact that Dr. Scheer received a deferred prosecution agreement suggests that the government could not establish that the medical services were not rendered or medically unnecessary.

For Mr. Katz individually, he has never previously been involved in criminal activity. He has accepted full responsibility for his actions, and repeatedly expressed remorse, both to the Court, and to his family and friends. As noted above, the collateral consequences for his actions are particularly severe. His former wife, with whom he is reconciled, will face severe financial distress and may well lose her home.[2] His elderly and infirm mother, to whom he is devoted

---

[2] Tanya's income for the last several years as a home health aide is extremely modest.

and extremely close, will lose her primary source of emotional support, as he is her only child. Finally, having accepted responsibility and agreeing to the order of restitution, see 18 U.S.C. §3553(a)(7), he will be obligated to make whole the insurance companies that he, with others, has defrauded. This will justly punish him, and with his felony conviction and difficulty finding work due to his age, will cause economic hardship for rest of his life.

## 2. Factors Under 18 U.S.C. §3553(a)(2)

The sentence the Court imposes must reflect the seriousness of the case, promote respect for the law, provide just punishment, afford deterrence, and protect the public from further crimes of the defendant. As discussed above, Mr. Katz has and will suffer greatly for his actions and fully appreciates the seriousness of the case and will not violate the law again as the collateral consequences he has and will continue to suffer are already quite severe. Additionally, his age, previous employment status, criminal history category and category of his offense should be considered in respect to protecting the public from further crimes under §3553(a)(2)(C).

Older defendants such as Mr. Katz, who is fifty-six years old, exhibit remarkably lower rates of recidivism compared to younger defendants. United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004) at 12. "Among all

20

defendants under age 21, the recidivism rate is 35.5 percent, while offenders over age 50 have a recidivism rate of 9.5 percent." Id. Courts in the Second Circuit and elsewhere routinely consider this in fashioning a below guidelines sentence. See, e.g., United States v. Hodges, 2009 WL 366231 at *9 (E.D.N.Y. 2009)(as "the Guidelines do not take into account the inverse relationship between age and recidivism . . . I will take into account defendant's age in fashioning his sentence"); United States v. Sanchez, 2007 WL 60517 at *4(S.D.N.Y.)(court declines to impose lengthy sentence due to defendant's age and concomitant reduced recidivism rates);   United States v. Hernandez, 2005 WL 1242344 at **5-6 (S.D.N.Y.)(imposing a term of incarceration of fifty months on a 48-year-old defendant where the Guidelines recommended a minimum term of 70 months); United States v. Carmona-Rodriguez, 2005 WL 840464 at *5 (S.D.N.Y.)(imposing a term of incarceration of 30 months on a 54-year-old defendant where the guidelines recommended a minimum term of 46 months); United States v. Barbera, 2005 WL 2709112 (S.D.N.Y.)(court notes lower likelihood of recidivism given defendant's age of 56-years),   Simon v. United States, 361 F.Supp.2d 35, 48 (E.D.N.Y. 2005)(imposing a term of incarceration of 262 months on a 43-year-old defendant where the guidelines recommended a minimum term of 324-405 months); and United States v. Nellum, 2005 WL 300073 at *3(N.D. Ind.)(imposing a term of incarceration of 108 months on a 57-year old defendant where the

21

Guidelines recommended a minimum of 168 months).

Moreover, defendants like Mr. Katz, whose criminal history category is I, have substantially lower risk of recidivism within two years (13.8%) than do offenders in criminal history category VI (55.2%).    United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004) at 6.    Also, defendants with stable employment in the year prior to the instant offense are less likely to recidivate (19.6%) than those who were unemployed (32.4%). Id. at 12.    Finally, offenders who have committed fraud are overall among the least likely to recidivate (16.9%, based on defendants sentenced in 1992). Id. at 13.    All these factors suggest that a defendant like Mr. Katz will not recidivate and thus this factor should be considered by this Court in sentencing.

## V. CONCLUSION

Given Mr. Katz's age, his full acceptance of responsibility for his actions, the nature of his offense, the unique circumstances of this case, the restitution to be imposed, the severe collateral consequences that he faces, and the slim chances for recidivism, we ask that the Court impose a non-custodial sentence to enable Mr. Katz to find gainful employment and become a productive member of society.

22

Respectfully submitted,

*Kenneth J. Kaplan*

Kenneth J. Kaplan
KAPLAN & KATZBERG
767 Third Avenue, 26th Fl.
New York, New York 10017
(212) 750-3100
Counsel for Ruven Katz

Dated:  New York, New York
        September 27, 2013

To:   Martin Bell, Esq.
      Assistant U.S. Attorney

      Ms. Lyvia Ramos,
      U.S. Probation Officer

23